UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ALH PROPERTIES NO. FOURTEEN, LP, | § | Case No. 21-31797 (DRJ) |
| | § | |
| Debtor.[1] | § | |
| | § | |
| | § | |

**DECLARATION OF NICHOLAS J. MASSAD, JR. IN SUPPORT
OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Nicholas J. Massad, Jr., being duly sworn, depose and say:

1. I am the President of the general partner of ALH Properties No. Fourteen, LP ("ALH" or the "Debtor"). I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtor.

2. I have been the President of the general partner of the Debtor since the Debtor's inception in 2011. I am also the President of American Liberty Hospitality Inc., which is my family's hotel management and development company. American Liberty Hospitality, Inc. operates approximately 16 hotels, including the Debtor's hotel, primarily in the Houston and Galveston areas. I have been involved in Houston's hotel industry for over 50 years and have been in top leadership positions within various hospitality industry groups and many community activities in Houston. I am the past President of both the Greater Houston Convention and Visitors Bureau and the Greater Houston Hotel and Lodging Association. My wife of 45 years and our 3 children are alums of the University of Houston Hilton College, and we are incredibly

---

[1] The last four digits of the Debtor's federal tax identification number are -0252. The address of the Debtor's headquarters is 1515 Dallas Avenue, Houston, Texas 77010.

1

proud of the Massad Family Library there. Also, I am honored to have received the Hilton Hotels Lifetime Achievement award in 2016.

3. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtor's senior management, my review of relevant documents or, based on my experience and knowledge of the Debtor's operations, financial conditions, and the market. In making this Declaration, I have relied, in part, on information and materials that the Debtor's personnel and advisors have gathered, prepared, verified, and provided to me in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

4. To minimize any disruption to the Debtor's operations and to ensure a smooth transition into chapter 11, the Debtor intends to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with the chapter 11 case (the "Chapter 11 Case").[2] I submit this declaration in support of the Debtor's (a) voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings.

5. This Declaration is divided into two parts. Part I provides background information about the Debtor, its business operations, its capital structures, and the circumstances surrounding the commencement of the Chapter 11 Case. Part II sets forth the evidentiary basis for the relief requested in each of the First Day Pleadings.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

10889156

# PART I – BACKGROUND AND EVENTS LEADING TO FILING OF CHAPTER 11 CASE

### A. Overview

6. The Debtor is the owner and operator of the Embassy Suites Houston Downtown near Discovery Green Park, located at 1515 Dallas Street in downtown Houston, Texas. The Debtor is a full service hotel with 262 guest suites, 3,600 square feet of meeting space, a restaurant, bar, room service, gift shop, valet parking and other amenities.

### B. The Debtor's Business

7. I have been involved with the Debtor since 2009, when it acquired the real property and obtained plans to build the hotel. The original cost of the land and hotel was approximately $59 million. The Debtor's hotel opened in 2011, and in 2013, it obtained the current loan in the original principal amount of $44,750,000 (the "Mass Mutual Loan"). The Debtor was profitable and timely paid every principal and interest payment due under the Mass Mutual Loan through and including April 2020.

8. Beginning in March 2020, the effects of the COVID–19 coronavirus pandemic and its devastating impact on travel and the worldwide economy resulted in a near total shutdown of downtown Houston, including business travel, sporting events, and the convention business upon which the Debtor heavily relies. To put the effect of COVID-19 and the resulting governmental restrictions into perspective, the Debtor's 2020 revenues were approximately $4.88 million, compared to over $14.49 million in 2019 and $14.37 million in 2018. Further, the Debtor's revenue for the trailing 12 month period impacted by the COVID-19 pandemic was $2.7 million—merely 19% of the Debtor's revenues in 2019. A chart showing annual revenues from 2013 through 2020, and 2020-2021 month-by-month revenues is attached hereto as **Exhibit A**.

3

10889156

### C. Events Leading to Chapter 11 Filing

9. The Debtor filed this Chapter 11 Case in response to aggressive actions taken by the Debtor's secured lender, Massachusetts Mutual Life Insurance Company ("Mass Mutual"). Mass Mutual posted the Debtor's property for foreclosure amidst a global pandemic that has wreaked havoc on the hospitality industry worldwide, and on conventions and all other events in downtown Houston in particular. Due to the long booking cycle for groups and conventions, Downtown markets across the nation were the hardest hit and will take the longest to recover of all hotel segments.

10. The Debtor's revenues have been insufficient to satisfy its obligations since April 2020. Since that time, the Debtor has been funding all of its 2020 operating shortfalls with contributions from its equity holders. Since April 2020, the Debtor's operating losses have totaled $1,768,061.33.

11. As discussed in more detail below, the Debtor also reached agreement with Mass Mutual on a short term forbearance in May 2020 that resulted in the monthly loan payments from May through July 2020 being deferred with interest until May 1, 2021. The Debtor did not make principal and interest payments for the months of August through November 2020, and while it attempted to make certain payments thereafter, none were accepted. The Debtor has made no payments that were accepted by Mass Mutual in 2021.

12. The Debtor made numerous proposals in an attempt to resolve issues with Mass Mutual and their wholly owned subsidiary and loan servicer, Barings. In particular, the Debtor proposed to make payments from a capital expenditure reserve that is not required by Hilton, the Debtor's franchisor. The Debtor also proposed a sale and leaseback of the land and offered the Lender $10+ million cash to pay down the loan, and also to escrow the debt service and lease

4

payments through Maturity. The Debtor has repeatedly requested more time to raise funds, and in December 2020, the Debtor tendered two monthly principal and interest payments. Those payments were rejected and returned by Barings. In January 2021, the Debtor offered to fund a property tax reserve and tendered the associated funds to Barings. Barings and Mass Mutual declined that proposal and returned the funds. In recent months, market conditions for travel and the hotel industry have improved and the Debtor's operating account reflects an increased cash flow as a result. This increase, however, has been insufficient to date to meet Mass Mutual's stringent demands, and Mass Mutual has outright refused to accept anything less than a complete cure of the COVID-19-induced defaults. In sum, instead of engaging with the Debtor, or accepting its good faith partial payments and offers to pay, Mass Mutual instead accelerated the loan and posted the Debtor's property for foreclosure to occur on February 2, 2021, March 2, 2021, April 6, 2021, May 4, 2021, and June 1, 2021.

13. Recently, it has come to my attention that Mass Mutual or Barings has apparently engaged a hotel management company, believed to be Remington Hotels or Remington Lodging ("Remington"), and that Mass Mutual or its agents took actions to improperly interfere with the operation and management of the Embassy hotel. Namely, it appears that Mass Mutual or its agents (i) applied with the governmental authorities for a liquor license associated with the Embassy property and thereby jeopardizes the Debtor's own liquor license, (ii) falsely represented that Remington will be taking over management and operations of the Embassy hotel and thereby spread fear and concern amongst various parties, including employees, and jeopardized the Debtor's ability to maintain a workforce to operate the hotel; and (iii) improperly interfered in the Debtor's franchise relationship with Hilton Hotels Corporation which could negatively effect the Debtor's relationship with Hilton. On May 25, 2021, the Debtor sent a

demand that Mass Mutual and its agents cease and desist with such improper interference in the Debtor's ability to operate and manage the hotel.

14.     Additionally, between February 15, 2021 and February 18, 2021, the freezing temperatures from Winter Storm Uri caused state-wide power outages and left the Property with severe water damage from burst pipes. Notably, 27 rooms and one boardroom were affected and some remain unusable without extensive repairs. Remediation of the damage has already commenced. The Debtor estimates the costs of such necessary remediation to the Property to be approximately $510,000. The Debtor has filed a property damage claim and a business interruption claim with its insurers. Contrary to most weather events, this storm produced minimal revenues as the hotel did not have water, and therefore did not have linens, nor employees needed to operate.

### D. The Debtors' Corporate and Capital Structure

15.     The Debtor is 25% owned by its general partner CBD Hospitality, Inc., ("CBD Hospitality") a sub-chapter S-Corp, and 75% owned by its limited partner Almaty Insaat Turizm Tayirim Sanayi ("Almaty").

16.     The following description of the Debtor's capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

   **i.   *Prepetition Capital Structure***

   **(a) Mass Mutual Loan Agreement**

17.     The Debtor is the borrower under the Promissory Note (the "Note") dated as of March 7, 2013 and Loan Agreement (the "Loan Agreement"), by and among the Debtor and

Mass Mutual, Nicholas J. Massad, Jr. (the "Guarantor"), as guarantor, and Cornerstone Real Estate Advisers LLC, as administrative agent therewith (the "Administrative Agent").

18. The obligations due under the Note and Loan Agreement are secured by (i) the Deed of Trust, Assignment of Lease and Rents, Security Agreement and Fixture Filing (the "Mortgage") dated as of March 7, 2013; (ii) the Assignment of Leases and Rents (the "Assignment") dated as of March 7, 2013; (iii) the Recourse Guaranty Agreement dated as of March 7, 2013, executed by Nicholas Massad, Jr. (the "Guaranty"); (iv) the Environmental Indemnification Agreement dated March 7, 2013 (the "Environmental Indemnity"); and (v) certain other loan documents (collectively, the "Loan Documents). The Note matures on April 1, 2023.

19. As of April 13, 2021, the principal balance of the Note according to the Lender was $40,135,818.56, not including accrued interest and other potentially alleged charges, including a prepayment penalty. Principal and interest under the Mass Mutual Loan is due and payable monthly. The Debtor has not made principal and interest payments since April 2020, although the Debtor attempted to make certain payments that were rejected by the Lender, as described herein. The Debtor and Mass Mutual entered into a forbearance agreement in May 2020, which provided that the monthly principal and interest payments from May through July 2020, were deferred until May 2021. The deferred payments were not made in May 2021.

20. On November 10, 2020, counsel to Barings (the "Servicer") sent the Debtor a notice of default. On January 12, 2021, Barings sent the Debtor a notice stating that the Note had been accelerated effective as of November 24, 2020 and that the collateral had been posted for foreclosure. The Servicer, through counsel, posted the property for foreclosure each month since

10889156

February 2021. However, no foreclosures have occurred in Harris County because of moratoriums issued by Harris County Judge Lina Hidalgo.

21. The Debtor made numerous proposals in an attempt to resolve issues with Mass Mutual and Barings. For example, the Debtor proposed to make payments from a capital expenditure reserve that is not required by Hilton, the Debtor's franchisor. The Debtor has also repeatedly requested more time to raise funds, and in December 2020, the Debtor tendered two monthly principal and interest payments. Those payments were either rejected or initially accepted by Barings and later returned at the direction of Mass Mutual. In January 2020, the Debtor offered to fully fund a property tax reserve in light of the upcoming tax payment deadline. Barings and Mass Mutual again declined that proposal.

22. In sum, the Debtor's efforts to resolve its issues with Mass Mutual and Barings have been rejected. Instead of engaging with the Debtor, or accepting its partial payments and offers to pay, Mass Mutual instead accelerated the loan and posted for foreclosure.

**(b) 2020 Operations and Other Obligations**

23. Since the onset of COVID-19 and the resulting shutdowns, the Debtor has continued operating using its meager revenues and contributions from equity holders. While the Debtor has been able to keep its doors open, it has accumulated substantial accounts payable including its franchise fee to Hilton, management fees to its affiliated management company, and amounts to other vendors. The total amount of these non-Lender obligations is approximately $503,298.08.

24. As mentioned, the Debtor has been funding all of its operating shortfalls with contributions from its equity holders. Most recently, since November 17, 2020, the Debtor's equity holders have contributed $1,768,061.33 to the Debtor's Operating Account (the "Equity

8

Contributions"). The Operating Account is the Debtor's main bank account which receives daily revenues (both cash and credit card deposits) and from where expenses are paid. The Debtor maintains this account for the payment of substantially all operating costs, including payment to certain vendors directly (such as utilities, certain staffing obligations, and others) and payment to its affiliate management company.

### ii. *Unsecured Debt and Significant Contracts*

25. The Mass Mutual Loan is the Debtor's only funded debt. The Debtor also has various other obligations, including obligations under the Franchise License Agreement (the "Franchise Agreement"). The Franchise Agreement provides for the Debtor to license the Hilton Hotels Corporation ("Hilton") brand name for a monthly fee, based on the gross rooms' revenue of the hotel, from the effective date, October 24, 2007, until October 31, 2029. The Debtor owes approximately $140,639.01 under the Franchise Agreement.

26. American Liberty Hospitality, Inc. (the "Manager") and the Debtor entered into a Management Agreement, effective April 1, 2011. As referenced above, the Manager is my family owned and operated hotel management company. Under the Management Agreement, the Manager provides services associated with operating the hotel including but not limited to submitting an annual budget of operations; recruiting, hiring, employing, and supervising the work of all operating and service employees; entering into certain leases and other service contracts required in the ordinary course of business; purchasing operating supplies necessary to maintain and operate the hotel; and repairing, replacing and making improvements (collectively, and as further described in the Management Agreement, the "Management Services"). The Manager is reimbursed directly for costs it incurs and is paid a 2% fee of total revenue (the "Base Management Fee"), an accounting fee of $3,275.00 per month (the "Accounting Fee"), and a

revenue management fee of $6,337.00 per month (the "Revenue Management Fee" and collectively with the Base Management Fee and Accounting Fee, the "Management Services Fees"). The Base Management Fee is below the market (typically 3% of total revenue), and the Accounting and Revenue Management Fees are competitive in the market.

27. Utilizing the Management Services provides the Debtor with significant and numerous administrative and operational benefits. Among other things, the Management Services have led to a more efficient use of the Debtor's resources. Thus, continued access to, and performance of their obligations in connection with, the Management Services is ultimately a net benefit to the estates—enabling the Debtor to continue its operations and minimize operational disruptions following the commencement of the Chapter 11 Case. These benefits include:

- A below industry standard Base Management Fee of 2% (industry standard is 3%), saving approximately $100,000 per year;

- "Complexing" effect on cost of goods, services, and labor from quantity purchasing with the Manager's other 3 managed hotels in downtown Houston, which results in an approximate savings of $400,000 per year; and

- Increased revenues from combining sales and marketing efforts for the Manager's 4 managed hotels in downtown Houston.

28. Further, the Manager provides numerous services and functions to the Debtor that would be extremely difficult and prohibitively expensive for the Debtor to replace. For example, the Debtor does not currently have its own resources necessary to operate its business, including, but not limited to, accounting systems, a revenue management department, or human resources systems (including software, employee data, and benefits administration). Also, the Debtor does not currently employ its own workforce that manages such necessary functions like accounting and human resources. Nor does the Debtor employ its own staff necessary to operate as a hotel

open to the public, including, but not limited to, general manager, director of sales, front-desk operations, and housekeeping. The Debtor would incur severe hardship in attempting to operate its businesses in any form, let alone in a "business-as-usual" manner, absent the Management Agreement.

29. Since November 2020, the Manager has not collected certain of its Base Management Fee, Accounting Fees and Revenue Management Fees, as well some reimbursable expenses, from the Debtor in an attempt to conserve operating cash for the Debtor. As of the Petition Date, the amount of Management Services Fees and reimbursable expenses owed under the Management Agreement totals approximately $113,653.17, including $93,007.52 in past due amounts.

30. In addition, the Debtor has obligations to various service providers and vendors, including linen providers, staffing services for valet parking, housekeeping, and security, and utilities.

### E. Value and Outlook

31. As of April 13, 2021, the principal balance of the loan was alleged by Mass Mutual to be $40,135,818.56 and as set forth in more detail below, I believe that the value of the Debtor's assets far exceeds that amount and any accrued interest and fees.

32. The timing for the Debtor's return to profitability is uncertain but there is cause for optimism. Progress is being made in the approval and distribution of COVID-19 vaccines and the financial markets appear to be anticipating an economic recovery. The hotel has started to see an increase in revenues and future bookings. March and April 2021 revenues were approximately $440,000 and $520,000, respectively, which is the most since the onset of COVID-19. While the situation is improving, more time is needed before the Hotel can again

service its debt. Downton Houston Convention Center bookings for the second half of 2021 reflect a positive trend in travel.

33. Likewise, my outlook for the downtown Houston area, based on my years of experience operating hotels there, is bullish. One recent example is Skanska USA Commercial Development's recent announcement that it will soon build a 375,000-square-foot, 28-story office tower on the same block as the Embassy Suites and adjacent to Discovery Green. The developer recently announced that construction will begin in June 2021 and be complete in about two years. Norton Rose Fulbright, with approximately 200 attorneys, will be the anchor tenant. This will provide an additional boost in room night demand for the Debtor.

34. I was involved in the ground up development, ownership and operation of the Debtor's Hotel Property since before it opened in 2011 and am intimately familiar with the Hotel, its financial history, and the downtown Houston hospitality market.

35. As set forth herein, I have been in the hotel industry for over 50 years and have owned and operated dozens of hotels with various partners. I currently sponsor and operate 2 other hotels in downtown Houston with 8 more in the greater Houston area. Based on all of the above factors and my extensive experience buying, selling and valuing hotel assets, I believe the Debtor's Hotel Property as of June 2021 is worth a minimum of $60 million. With market conditions improving, the hotel values are increasing monthly.

36. The Debtor filed this chapter 11 case to stay Mass Mutual's aggressive actions and to explore options to maximize value for all stakeholders. The Debtor has been constantly analyzing various potential options, including but not limited to a reinstatement plan under Bankruptcy Code section 1124, a new partner, a refinancing, or a ground sale of the Debtor's real property and a lease back of the hotel land by the Debtor with a significant pay down on the

10889156

loan to Mass Mutual. The General Partner and affiliates have never had to consider a Chapter 11 reorganization prior to this filing and the worldwide pandemic is the sole reason for the current position of the Debtor.

## PART II. FIRST DAY PLEADINGS

37. Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations, facilitate the efficient administration of the Chapter 11 Case, and enable the Debtor to pursue an effective reorganization strategy, including:

A. **Administrative:**

- **Complex Case Designation:** *Debtor's Notice of Designation as Complex Bankruptcy Case*

- **Schedules and Statements Extension Motion:** *Debtor's Emergency Motion to Extend Time to File Schedules and Statements of Financial Affairs*

B. **Finance Motions:**

- **Cash Management Motion:** *Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to (a) Continue Operating Its Cash Management System, (b) Honor Certain Prepetition Obligations, (c) Maintain Existing Bank Accounts and Business Forms; and (II) Granting Related Relief*

- **Cash Collateral Motion**: *Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing Use of Cash Collateral; and (II) Granting Related Relief*

C. **Operational Motions:**

- **Utilities Motion:** *Debtor's Emergency Motion to (I) Approve Adequate Assurance of Payment to Utility Companies, (II) Establish Procedures to Resolve Objections by Utility Companies, and (III) Prohibit Utility Companies from Altering, Refusing, or Discontinuing Service*

- **Management Agreement Motion:** *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Management Agreement*

- **Critical Vendor Motion**: *Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Payment of Claims of Critical Vendors, and (II) Granting Related Relief*

38. I have consulted with advisors regarding and understand each of the First Day Motions and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

39. I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will allow the Debtor to operate with minimal disruption and maximum value preservation during the pendency of the Chapter 11 Case. Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtor, its business, the employees that operate the hotel, and its estate. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

**D.     Request for Emergency Consideration**

40. The Debtor requests emergency consideration of the Schedules and Statements Extension Motion, the Cash Management Motion, the Cash Collateral Motion, the Utilities Motion, the Management Agreement Motion, and the Critical Vendors Motion. I believe that, based on the complexity of the Chapter 11 Case (as explained to me by Debtor's counsel) and the Debtor's urgent need to continue operations during this case, emergency consideration of such motions is warranted.

## Conclusion

41. The above describes the Debtor's business and capital structure, the factors that precipitated the commencement of the Chapter 11 Case, and the critical need for the Debtor to restructure its financial affairs and operations. The provisions of the Bankruptcy Code will assist

the Debtor in achieving its financial reorganization and reestablishing itself as a healthy economic enterprise able to effectively compete in its industry for the benefit of all economic stakeholders and to offset the devastating effects of COVID-19 on the hotel industry.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: May 31, 2021
Houston, Texas

By: */s/ Nicholas J. Massad Jr.*
Name: Nicholas J. Massad Jr.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on May 31, 2021, a true and correct copy of the foregoing Declaration was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system. The undersigned further certifies that the foregoing Declaration was served upon all parties listed on the attached Service List pursuant to the Federal and Local Bankruptcy Rules.

*/s/ Eric M. English*
Eric M. English

10889156

# SERVICE LIST

| | |
|---|---|
| **DEBTOR** | **REPRESENTED BY** |
| ALH PROPERTIES NO. FOURTEEN, LP<br>1515 DALLAS AVE<br>HOUSTON TX 77010 | ERIC M. ENGLISH<br>MEGAN YOUNG-JOHN<br>EMILY NASIR<br>1000 MAIN STREET, 36TH FLOOR<br>HOUSTON, TX 77002 |
| **US TRUSTEE** | **REPRESENTED BY** |
| OFFICE OF THE US TRUSTEE<br>515 RUSK AVE<br>STE 3516<br>HOUSTON TX 77002 | STEPHEN DOUGLAS STATHAM<br>HECTOR DURAN<br>OFFICE OF US TRUSTEE<br>515 RUSK AVE, STE 3516<br>HOUSTON TX 77002 |

**CREDITORS AND PARTIES IN INTEREST**

MASS MUTUAL
ATTN AGUINALDO VALDEZ
STUTZMAN BROMBERG ESSERMAN & PLIFKA
2323 BRYAN ST
DALLAS TX 75201

BARINGS
ATTN AGUINALDO VALDEZ
STUTZMAN BROMBERG ESSERMAN & PLIFKA
2323 BRYAN ST
DALLAS TX 75201

ALH HOTEL MANAGEMENT, LLC
2901 WILCREST DRIVE
SUITE 120
HOUSTON TX 77042

BROOKFIELD DISTRICT ENERGY USA, LLC
P.O. BOX 207851
DALLAS TX 75320

CITY OF HOUSTON WATER DEPARTMENT
P.O. BOX 1560
HOUSTON TX 777251

1

11089964

FIRETRON, INC.
P.O. BOX 1604
STAFFORD TX 77497

GERARDO DE LA GARZA
1515 DALLAS ST
HOUSTON TX 77010

GREATER HOUSTON CONVENTION & VISTORS BUREAU
701 AVENIDA DE LAS AMERICAS
SUITE 200
HOUSTON TX 77010

GUEST SUPPLY
P.O. BOX 6771
SOMERSET NJ 08875

HEARSAY DISCOVERY GREEN, LLC
P.O. BOX 301103
HOUSTON TX 77230

HILTON HOTELS CORPORATION
4649 PAYSPHERE CIRCLE
CHICAGO IL 60674

HOUSTON FIRST CORPORATION
701 AVENIDA DE LAS AMERICAS
STE 200
HOUSTON TX 77010

IMPERIAL LINEN, INC
P.O. BOX 1909
STAFFORD TX 77497-1909

PATRIOT SECURITY, EOC
P.O. BOX 1876
NEDERLAND TX 77627

POPP HUTCHESON PLLC
1301 S. MOPAC
SUITE 430
AUSTIN TX 78746

PRIME FACILITY GROUP
P.O. BOX 270568
HOUSTON TX 77277

2

11089964

SESAC, LLC
P.O. BOX 900013
RALEIGH NC 27675-9013

SOVEREIGN SERVICES OF HOUSTON, INC
P.O. BOX 460105
HOUSTON TX 77056

STERNEBERG & KROHN, LLC
5612 RAMPART ST
HOUSTON TX 77081

SYSCO FOOD SVCS OF HOUSTON
10710 GREENS CROSSING BLVD
HOUSTON TX 77038-2716

VISTAR
P.O. BOX 951080
DALLAS TX 75395-1080

WINSTON FINANCIAL GROUP, INC.
10430-28 PIONEER BLVD
SANTA FE SPRING CA 90670

INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATION
P O BOX 7346
PHILADELPHIA PA 19101-7346

INTERNAL REVENUE SERVICE
300 E 8TH ST
MAIL STOP 5026AUS
AUSTIN TX 78701

UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF TEXAS
1000 LOUISIANA ST STE 2300
HOUSTON TX 77002

11089964